IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CONTROLLED F.O.R.C.E., INC., an Illinois corporation,<br><br>                      Plaintiff,<br><br>    v.<br><br>ISS ACTION, INC., a New York corporation,<br><br>                      Defendant | No. 25-CV-7136<br><br>**Plaintiff Demands Trial By Jury of 12** |

### VERIFIED COMPLAINT AT LAW

NOW COMES Plaintiff, CONTROLLED F.O.R.C.E., INC., an Illinois corporation, by and through its attorneys, Law Offices of McLaughlin & Associates, P.C., and for its Verified Complaint at Law against Defendant, ISS ACTION, INC., a New York corporation, states as follows:

### Nature of the Action

1. This action is brought by Plaintiff, Controlled F.O.R.C.E., Inc., against Defendant, ISS Action, Inc. (collectively, the "Parties"), for breach of contract by Defendant in relation to a Subcontractor Agreement entered into the between the Parties.

2. The Parties entered into a Subcontractor Agreement (the "Subcontract") on March 28, 2024, under which Plaintiff would be responsible for 51% of services to be performed under a Blanket Purchase Agreement between Plaintiff and the Department of Homeland Security, U.S. Border Patrol ("CBP") dated May 21, 2024, and Defendant would be responsible for 49% of services under the Blanket Purchase Agreement.

3. Defendant failed to perform its duties under the Subcontract, leading to the termination of the Blanket Purchase Agreement and the loss of future business operations for Plaintiff with CBP.

**Parties**

4. Plaintiff, Controlled F.O.R.C.E., Inc., is an Illinois corporation with its principal place of business located at 335 N. River St., Suite 200, Batavia, Kane County, Illinois 60510.

5. Defendant, ISS Action, Inc., is a New York corporation with its principal place of business located at 204 E. McKenzie St., Unit E6, Punta Gorda, Florida 33950.

**Jurisdiction and Venue**

6. This Court has diversity jurisdiction over the Parties pursuant to 28 U.S.C. §1332(a)(1) because the Parties are corporations that are incorporated in different states, and the amount in controversy exceeds $75,000.00.

7. This Court has jurisdiction over this action and venue is proper because Paragraph 10(k) of the Subcontract establishes exclusive venue of claims under the Subcontract under either the state courts in Kane County, Illinois or the U.S. District Court for the Northern District of Illinois.

**Common Facts**

8. On May 21, 2024, Plaintiff entered into a contract with CBP for the provision of patrol guards ("the Guards") at the border patrol sectors located in and around Yuma, Arizona, Tucson, Arizona, El Centro, California, and San Diego, California ("Border Locations"), and for transportation of the Guards via buses and vans ("the Vehicles") to and from the Border Locations. A true and correct copy of said contract, entitled U.S. Customs and Border Protection Blanket

Purchase Agreement, BPA Number 70C03C24A00000024 is attached as Exhibit "A" ("the BPA/Prime Contract").

9. On May 28, 2024, Plaintiff entered into the Subcontract with Defendant, in which Plaintiff would provide 51% and Defendant would provide 49% of the Guards and Vehicles, respectively, required under the BPA/Prime Contract. A true and correct of said Subcontract Agreement is attached as Exhibit "B".

10. Paragraph A of the Recitals of the Subcontract identifies that Plaintiff bid on the BPA/Prime Contract.

11. Paragraph C of the Recitals of the Subcontract identifies that Plaintiff "will perform 51 percent of required services [under the BPA/Prime Contract], receiving 51 percent of compensation/income from the Customer," and Defendant "will perform 49 percent of required services, receiving 49 percent of compensation/income from the Customer." The "Customer" was CBP.

12. Paragraph 1 of the Subcontract provides that Defendant "shall perform the Subcontract Work as set forth on the Statement of Work."

13. Paragraph 3 of the Subcontract provides that Plaintiff "shall be responsible for all communications with the Customer concerning the BPA/Contract, and [Plaintiff] shall give [Defendant] a reasonable opportunity to be present at meetings with the Customer that may concern the Subcontract Work at the Prime Contractors (sic) discretion."

14. Paragraph 4(a) of the Subcontract provides that Defendant "shall comply with the terms and conditions of (i) the BPA/Prime Contract, this Agreement, and any Statement of Work providing for [Defendant] to perform Subcontract Work on behalf of Customer and (ii) all

applicable laws and regulations applicable to entities providing services of a nature similar to the Subcontract Work."

15. Paragraph 4(c) of the Subcontract provides that Defendant "warrants that all Subcontract Work performed pursuant to this Agreement, the BPA/Prime Contract, or a Statement of Work shall be performed in a good and workmanlike manner and will meet good security service industry standard quality requirements in the area where the Subcontract Work is performed."

16. Paragraph 4(d) of the Subcontract provides that Defendant "shall take all reasonable safety precautions with respect to its work and shall comply with all safety measures initiated by [Plaintiff] and with all applicable laws, ordinances, rules, regulations, and order of any public authority for the safety of persons or property. [Defendant] shall immediately report to [Plaintiff] any incident that occurs resulting in harm to any person or property during and related to the performance of Subcontract Work. [Defendant] shall be solely liable for the actions of its employees, agents, subcontractors, and other representatives in their performance of the Subcontract Work."

17. Paragraph 4(f) of the Subcontract provides that "prior to commencing Subcontract Work, [Defendant], at its sole expense, shall obtain and maintain in full force, insurance in such form and for such coverage as required by the [BPA/] Prime Contract and as reasonably required by [Plaintiff]."

18. Paragraph 4(f)(II) of the Subcontract provides that "each party shall, at its sole expense, obtain and maintain the following licensure: as required by the contract. (a) The state required transportation licensure. (b) State required armed guard licensure. (c) Department of Transportation Approval and Licensure. (d) State required approvals."

19. Paragraph 4(g) of the Subcontract provides that Defendant "agrees to pay all taxes, licenses, and fees levied or assessed on [Defendant] or its personnel in connection with or incidental to the performance of this Agreement or any Statement of Work…."

20. Paragraph 4(h) of the Subcontract provides that "in the event that the BPA/Prime Contract requires disclosure of personnel who will provide services under the BPA/Prime Contract ("Key Personnel"), [Defendant] will comply with the requirements of the BPA/Prime Contract relative to the disclosure of and qualification of its Key Personnel. [Defendant] may not change Key Personnel except as allowed under the BPA/Prime Contract. [Defendant] shall be fully responsible to accurately and truthfully represent the qualifications of Key Personnel and shall defend, indemnify, and hold harmless [Plaintiff] from any claims arising under the BPA/Prime Contract, this Agreement, or state or federal laws due to [Defendant's] misrepresentation of the qualifications of Key Personnel. [Plaintiff] reserves the right to direct [Defendant] to remove and/or replace Key Personnel which violates this paragraph."

21. Paragraph 4(i) of the Subcontract provides that Defendant "represents and warrants that its personnel have the required skill, experience, and qualifications to provide the services under the BPA/Prime Contract and this Agreement."

22. Paragraph 5 of the Subcontract provides, in part, that "in support of the BPA/Prime Contract, [Defendant] shall use its best efforts to perform the following tasks: (a) Provide support as required to assist [Plaintiff] in meeting the objectives outlined in each Statement of Work, including making available appropriately qualified personnel to work on [Defendant's] portion of the BPA/Prime Contract. (b) Provide date and information concerning [Defendant's] share of the [BPA/] Prime Contract, including timely responses to [Plaintiff's] requests for data or information needed by [Plaintiff] to successfully manage the BPA /Prime Contract."

23. Paragraph 6.1 of the Subcontract provides, in part, that "each party shall defend and indemnify the other party … against any and all claims, losses, damages, injuries, deaths, or expenses (including but not limited to reasonable attorneys' fees and court costs), whether arising in equity, at common law or by statute, or under the law of contracts, torts or property, in connection with the indemnifying party's performance under this Agreement…."

24. Paragraph 8 of the Subcontract provides, in part, that Plaintiff "may terminate this Agreement in whole or in part for default if [Defendant] fails to properly perform in accordance with the terms and conditions stated herein. Such terminations can occur only if [Plaintiff] provides [Defendant] with a written cure notice specifying the performance issues and [Defendant] fails to cure the default within thirty (30) workdays after receiving a notice specifying the default."

25. On August 15, 2024, CBP issued a Task Order with Order Number 70B03C24F00000530 and Requisition Reference Number 0020144820 to Plaintiff, to be paid to for services under the BPA, in the amount of $7,257,310.05 and with a total Not to Exceed amount of $24,672,766.64 (the "NTE Amount") (the "Task Order"). A true and correct copy of the Task Order is attached hereto as Exhibit C.

## COUNT I – BREACH OF CONTRACT

1-25. Plaintiff realleges Paragraphs 1-25 as though fully set forth herein.

26. Controlled Force substantially fulfilled its obligations under the BPA/Prime Contract and the Subcontract.

27. ISS breached the Subcontract in one or more of the following ways:

   a. Failed to provide 49% of the Guards and Vehicles required under Paragraph C of the Recitals and Paragraphs 1 and 4(a);

6

b. Attempted to communicate directly with CBP, without the knowledge or involvement of Controlled Force, in violation of Paragraph 3 which directs that all communications with CBP must occur through Plaintiff;

c. Failed to provide its share of trained and qualified Guards in violation of Paragraphs 4(c),(h), and (i);

d. Failed to provide its share of properly inspected, functioning, and safe Vehicles in violation of Paragraphs 4(c) and (d);

e. Failed to maintain adequate insurance for its share of Guards and Vehicles in violation of Paragraph 4(f);

f. Failed to maintain proper licensure for its share of Guards in violation of Paragraph 4(f)(II);

g. Failed to obtain proper transportation approvals for the Guards and Vehicles in violation of Paragraph 4(f)(II);

h. Failed to pay its share of taxes, licenses, and fees for the Guards and Vehicles in violation of Paragraph 4(g);

i. Interfered with Plaintiff's right to substitute or replace Key Personnel who did not meet the standards of the BPA/Prime Contract in violation of Paragraph 4(h);

j. Misrepresented the qualifications of its share of Key Personnel whom it knew or should have known did not meet the minimum qualifications required under the BPA/Prime Contract in violation of Paragraph 4(i);

k. Misrepresented that it had possession of the requisite number of Vehicles required for it to fulfill its share of the Vehicles; and

l.  Failed to timely share with Plaintiff information that was necessary to inform Plaintiff in a reasonably timely manner that Defendant lacked the resources or had inadequate resources to fulfill its obligations to furnish 49% of the Guards and Vehicles so that Plaintiff could obtain alternate sources for said Guards and Vehicles in violation of Paragraph 5.

28. At the time Defendant executed the Subcontract, it had been given a reasonable opportunity to review the BPA/Prime Contract and any obligations required under the BPA/Prime Contract for Defendant, including the requirements for Guards, Key Personnel, and Vehicles for the Border Locations.  Prior to signing the subcontract, Defendant represented that it was able to fulfill its obligations.

29. Nonetheless, Defendant failed to fulfill its obligations under the Subcontract and BPA/Prime Contract, claiming that the expenses were higher than anticipated, which is claimed in a Request for Equitable Adjustment of the contract price from CBP.

30. CBP did not approve the Request for Equitable Adjustment, obligating Defendant to fulfill the terms of the Statement of Work under the Subcontract and BPA/Prime Contract as submitted.

31. Defendant continued to demand an adjustment to the contract price before it would complete its obligations under the Subcontract, in breach of the Subcontract.

32. The Task Order was scheduled to begin on August 15, 2024, but Defendant refused to provide its share of the Guards and Vehicles.

33. Due to Defendant's breach in failing to provide Guards and Vehicles as required under the Subcontract, on September 23, 2024, Plaintiff's president, Diana Grano ("Grano"), emailed Defendant's president and CEO, Pamela Newman ("Newman"), and informed her that

Defendant's non-compliance was a breach of contract. Ms. Grano asked Ms. Newman: "I kindly ask that you reconsider your decision not to begin work on this contract. Time is of the essence, and without your engagement, I will be forced to subcontract the work elsewhere." A true and correct copy of this email is included in Exhibit "D."

34. On September 23, 2024, Defendant's Director of Legal and Compliance, Hannah Schuster (Daphna) ("Schuster") emailed Grano and refused to resume work without the approved Request for Equitable Adjustment, which Schuster knew had already been rejected by CBP. Schuster acknowledged Plaintiff's notice of breach but insisted, incorrectly, that the Subcontract was in effect until October 15, 2024. A true and correct copy of this email is included in Exhibit "D."

35. In response to Schuster's September 23, 2024, email, on September 26, 2024, the undersigned Plaintiff's counsel sent a notice of termination with a cure period pursuant to Paragraph 8 of the Subcontract. This notice informed Defendant that the cure period is 30 days because the Subcontract required services 7 days per week, and therefore 30 "workdays" are 30 days. The cure period was therefore properly September 6, 2024, but was extended to October 12, 2024. The notice required Defendant to provide certain Vehicles, namely 6 coaches and 3 vans with equipment to Yuma, Arizona and 8 buses and 7 vans to San Diego, California with equipment by October 12, 2024, to avoid default. A true and correct copy of said Notice of Subcontract Agreement Termination dated September 26, 2024, is attached as Exhibit "E" ("Termination Notice").

36. Defendant failed to provide the Vehicles specified in the Termination Notice. Therefore, Plaintiff terminated the Subcontract by letter to Defendant on October 16, 2024. A true and correct copy of said letter of termination is attached as Exhibit "F."

37. As a direct and proximate result of Defendant's breach of the Subcontract, Plaintiff was unable to fulfill Defendant's share of the BPA/Prime Contract and Task Order within the time frames set forth in the BPA/Prime Contract and Task Order.

38. As a result, on December 26, 2024, CBP sent a 30-day Cure Notice to Plaintiff demanding that it comply with 100% of the requirements for Guards and Vehicles by January 26, 2025. A true and correct copy of CBP's 30-Day Cure Notice is attached as Exhibit "G."

39. At its expense, and using all reasonable diligence, Plaintiff attempted to fulfill Defendant's share of the obligations for Guards and Vehicles. It was able to fulfill the Guard obligations but not the Vehicle obligations.

40. As a result of Plaintiff's inability to fulfill 100% of the requirements for Vehicles under the BPA/Prime Contract and Task Order, which were directly attributable to Defendant's breach, CBP terminated the BPA/Prime Contract and Task Order. A true and correct copy of CBP's Notice of Termination is attached as Exhibit "H."

41. But for Defendant's breach of the Subcontract, Plaintiff would have fully complied with the terms of the BPA/Prime Contract, Task Order, and Subcontract, as Plaintiff successfully provided over 51% of the Guards and Vehicles.

42. Under the BPA/Prime Contract, the Task Order had an initial price of $7,257,310.05, out of a total of up to $24,672,766.64 under the BPA. 51% of the initial Task Order price is $3,701,228.12. 51% of the NTE Amount is $12,583,110.98. CBP paid Plaintiff $1,215,474.53 and refused to pay Plaintiff the balance. As a direct and proximate result of Defendant's breach, Plaintiff lost the 51% of the value of the contract price it expected, or $2,485,753.59 (under the Task Order) or $11,367,636.45 of the NTE Amount, after credits for CBP reimbursements.

43. In an effort to salvage the BPA/Prime Contract after Defendant's breach, Plaintiff incurred out of pocket expenses for labor, materials, mileage, repair costs, legal fees, and other expenses reasonably incurred in connection with fulfillment of Defendant's share of the BPA/Prime Contract in the amount of $5,295,870.32.

44. Unbeknownst to Plaintiff, in breach of Paragraph 3 of the Subcontract, Defendant communicated directly with CBP to secure its own contract substantially similar to the BPA/Prime Contract by cutting out Plaintiff from the negotiations and by redirecting Vehicles and drivers earmarked for BPA/Prime Contract towards this new contract. These facts are supported by January 19, 2025, communications from Ronald Dyer, CBP Transportation Officer, attached as Exhibit "I" and Defendant's extension notice for said contract until August 12, 2025, attached as Exhibit "J.".

45. Due to Plaintiff's inability to comply with all terms of the BPA/Prime Contract and Task Order due to Defendant's breach, CBP issued a Notice of potential suspension and debarment to Plaintiff on April 7, 2024. A true and correct copy of CBP's Notice is attached hereto as Exhibit "K".

46. Paragraph 6.1 of the Subcontract provides, in part, that "each party shall defend and indemnify the other party … against any and all claims, losses, damages, injuries, deaths, or expenses (including but not limited to reasonable attorneys' fees and court costs), whether arising in equity, at common law or by statute, or under the law of contracts, torts or property, in connection with the indemnifying party's performance under this Agreement…."

47. Therefore, as a direct and proximate result of Defendant's breach of contract, as set forth herein, Defendant is liable to Plaintiff in excess of $5,300,000.

WHEREFORE, Plaintiff, Controlled F.O.R.C.E., Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, ISS Action, Inc., in an amount to be determined by the trier of fact in excess of $5,300,000 plus Plaintiff's attorneys' fees and costs, and any such other relief as justice may require.

## COUNT II

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT

1-25. Plaintiff realleges Paragraphs 1 through 25 as though fully set forth herein.

26. In an effort to induce CBP to terminate the BPA/Prime Contract with Plaintiff, Defendant, through Newman and Schuster, contacted one or more union officials for the drivers who could drive the Vehicles under the BPA/Prime Contract and asked them not to drive any Vehicles if requested by Plaintiff.

27. The purpose of this request was to prevent Plaintiff from retaining sufficient qualified drivers who could fulfill Defendant's obligations under the Subcontract, leading CBP to terminate the BPA/Prime Contract.

28. Simultaneously, Defendant, through Newman and Schuster, communicated with CBP and informed CBP that Defendant could obtain the necessary drivers to fulfill the terms of a contract substantially similar to the BPA/Prime Contract. The result was that Defendant successfully induced CBP to terminate the BPA/Prime Contract and Task Order with Plaintiff and award a contract substantially similar to the BPA/Prime Contract to Defendant.

29. As a party to the Subcontract, Defendant knew that Plaintiff had a contract with CBP under the BPA/Prime Contract and Task Order.

30. Defendant knew that the reason Plaintiff could not fulfill 100% of the obligations of the BPA/Prime Contract and Task Order was because Defendant had breached the Subcontract as set forth herein.

31. As a result, Defendant had no reasonable justification to induce CBP to terminate the BPA/Prime Contract with Plaintiff because it knew Defendant's wrongful actions in failing to fulfill its obligations under the Subcontract were the reason Plaintiff was at risk of losing the BPA/Prime Contract through no fault of Plaintiff.

32. But for Defendant's tortious interference with contract as set forth herein, CBP would not have terminated the BPA/Prime Contract or Task Order with Plaintiff.

33. As a direct and proximate result of Defendant's tortious interference with contract, Plaintiff has sustained losses equal to the value of the BPA/Prime Contract, Task Order, and expenses incurred to fulfill Defendant's obligations under the Subcontract in an amount in excess of $5,300,000, plus attorneys' fees and costs.

WHEREFORE, Plaintiff, Controlled F.O.R.C.E., Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, ISS Action, Inc., in an amount to be determined by the trier of fact in excess of $5,300,000 plus Plaintiff's attorneys' fees and costs, and any such other relief as justice may require.

## COUNT III

## COUNT II - FRAUD IN THE INDUCEMENT

1-25 Plaintiff realleges Paragraphs 1 through 25 as though fully set forth herein.

26. Prior to entering into the Subcontract, Defendant, through Newman, misrepresented to Plaintiff, through Grano, that Defendant had experience in transportation and with compliance

with Department of Transportation regulations such that it would be able to comply with the requirements of the BPA/Prime Contract.

27. Prior to entering into the Subcontract, Defendant, through Newman, misrepresented to Plaintiff, through Grano, that Defendant had possession of or immediate access to sufficient buses and vans which met the standards of the BPA/Prime Contract for the Vehicles, such that it could comply with the deadlines and within the budgeted expenses set forth in the BPA/Prime Contract.

28. In fact, Defendant did not have sufficient experience with Department of Transportation regulations to obtain the necessary licensing and permits for the Vehicles required to fulfill its obligations under the Subcontract.

29. In fact, Defendant did not possess or have immediate access to sufficient buses or vans which met the standards for the Vehicles set forth in the BPA/Prime Contract so that it could comply with the deadlines and within the budgeted expenses set forth in the BPA/Prime Contract.

30. Plaintiff attempted to vet Defendant's qualifications through the Small Business Administration's Mentor-Protégé Program and through communications with other similar business owners; thus, Plaintiff exercised reasonable diligence to determine whether Defendant would be a qualified subcontractor to fulfill its obligations under the BPA/Prime Contract. Through reasonable diligence, Plaintiff could not reasonably ascertain that Defendant lacked the experience and access to buses and vans claimed by Newman.

31. Plaintiff reasonably relied upon Defendant's misrepresentations as set forth herein.

32. Defendant knew that Plaintiff reasonably relied upon Newman's misrepresentations to Grano and intended that Plaintiff rely upon those misrepresentations to secure the Subcontract.

33. But for Defendant's misrepresentations, Plaintiff would not have entered into the Subcontract with Defendant and would have continued to seek a qualified company which could fulfill Defendant's obligations under the Subcontract.

34. As a direct and proximate result of Defendant's misrepresentations, Plaintiff has sustained losses equal to the value of the BPA/Prime Contract, Task Order, and expenses incurred to fulfill Defendant's obligations under the Subcontract in an amount in excess of $5,300,000, plus attorneys' fees and costs.

WHEREFORE, Plaintiff, Controlled F.O.R.C.E., Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, ISS Action, Inc., in an amount to be determined by the trier of fact in excess of $5,300,000 plus Plaintiff's attorneys' fees and costs, and any such other relief as justice may require.

## COUNT IV

## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

1-25. Plaintiff realleges Paragraphs 1 through 25 as though fully set forth herein.

26. In an effort to induce CBP to terminate the BPA/Prime Contract with Plaintiff, Defendant, through Newman and Schuster, contacted one or more union officials for the drivers who could drive the Vehicles under the BPA/Prime Contract and asked them not to drive any Vehicles if requested by Plaintiff.

27. The purpose of this request was to prevent Plaintiff from retaining sufficient qualified drivers who could fulfill Defendant's obligations under the Subcontract, leading CBP to terminate the BPA/Prime Contract.

28. Simultaneously, Defendant, through Newman and Schuster, communicated with CBP and informed CBP that Defendant could obtain the necessary drivers to fulfill the terms of a

15

contract substantially similar to the BPA/Prime Contract. The result was that Defendant successfully induced CBP to terminate the BPA/Prime Contract with Plaintiff and award a contract substantially similar to the BPA/Prime Contract to Defendant.

29. As a party to the Subcontract, Defendant knew that Plaintiff had a contract with CBP under the BPA/Prime Contract.

30. Defendant knew that the reason Plaintiff could not fulfill 100% of the obligations of the BPA/Prime Contract was because Defendant had breached the Subcontract as set forth herein.

31. As a result, Defendant had no reasonable justification to induce CBP to terminate the BPA/Prime Contract with Plaintiff because it knew Defendant's wrongful actions in failing to fulfill its obligations under the Subcontract were the reason Plaintiff was at risk of losing the BPA/Prime Contract through no fault of Plaintiff.

32. As a direct and proximate result of Defendant's breach of contract and tortious interference with the BPA/Prime Contract, CBP believes that Plaintiff may not be able to reliably complete future contracts because of Defendant's failure to provide vehicles, and is considering suspension and disbarment of Plaintiff on future CBP projects.

33. Prior to Defendant's actions, Plaintiff had a 20+ year successful relationship with the U.S. Government, including CBP, in multiple states.

34. As a direct and proximate result of Defendant's tortious interference with business expectations, Plaintiff has sustained losses of any and all business opportunities available through CBP and related state and federal agencies, in an amount to be determined by the trier of fact, but estimated to be in excess of $24,000,000.00, plus attorney's fees and costs.

WHEREFORE, Plaintiff, Controlled F.O.R.C.E., Inc., prays that this Honorable Court enter judgment in its favor and against Defendant, ISS Action, Inc., in an amount to be determined by the trier of fact in excess of $24,000,000.00 plus Plaintiff's attorneys' fees and costs, and any such other relief as justice may require.

Respectfully submitted,

CONTROLLED F.O.R.C.E., INC.

By: _____
Attorney for Plaintiff

Kenneth S. McLaughlin, Jr.
Law Offices of McLaughlin & Associates, P.C.
1 E. Benton Street, Suite 301
Aurora, Illinois 60505
(630) 449-4598
kmclaughlin@ma-lawpc.com
ARDC No. 6229828

## VERIFICATION BY CERTIFICATION

The undersigned declares under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing Verified Complaint at Law is true, except as to matters stated upon information and belief, and as to those matters, the undersigned lacks sufficient information or knowledge to form a belief as to the truthfulness of those allegations.

CONTROLLED F.O.R.C.E., INC.

By: *Diana Grano*

Diana Grano, Its President